IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 1, 2024 Session

## STATE OF TENNESSEE v. JUAN DESHAUN HOYLE

**Appeal from the Circuit Court for Madison County**
**No. 22-650    Donald H. Allen, Judge**

_____

### No. W2023-01129-CCA-R3-CD
_____

Defendant, Juan Deshaun Hoyle, was convicted by a Madison County jury of two counts of unlawful possession of a firearm after having been convicted of a felony crime of violence (counts one and two), and one count each of unlawful possession of a firearm after having been convicted of a felony drug offense (count three), and simple possession of marijuana (count four). The trial court imposed an effective twenty-year sentence. On appeal, Defendant argues that there was insufficient evidence that he possessed a firearm and that the sentence imposed was not the least severe measure necessary. Following review of the entire record, oral arguments, briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Raven Prean-Morris, Assistant Public Defender – Appellate Division (on appeal), and Austin Bethany, Assistant Public Defender (at trial), for the appellant, Juan Deshaun Hoyle.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Bradley Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

On December 22, 2021, at approximately 1:00 a.m., Jackson Police Department ("JPD") officer Daniel Calderon responded to a potential domestic violence call at

America's Best Value Inn and Suites. Officer Calderon's body-worn camera was on and captured the entire interaction with Defendant; the recording was entered into evidence and played for the jury. Officer Calderon recalled that it was cold and dark that night with precipitation. Officer Calderon went inside the hotel while his partner made contact with the 911 caller. Because of the hour, the hotel clerk unlocked the door to allow Officer Calderon to enter. The hotel clerk identified Defendant on the hotel's live security feed as the man who was the suspect of the 911 call. Defendant was "pacing" in the hallway and holding his right arm close to his body with a jacket over his arm.

Based on Defendant's path of travel, the hotel clerk informed Officer Calderon that Defendant would be exiting through a side door of the hotel. Officer Calderon went to the side door and saw Defendant walk out of the hotel. Defendant still had his right arm bent and held close to his body with a dark-colored jacket hanging over his arm. There were no other people visible in the parking lot of the hotel. Officer Calderon called out to Defendant that he wanted to speak with him; Defendant pointed behind Officer Calderon and stated, "That's him right there!" Defendant then continued to quickly walk away from Officer Calderon, and started running when he realized Officer Calderon was still walking toward him. While chasing Defendant, Officer Calderon called other officers on his radio to notify them the direction Defendant was running.

As Defendant turned a corner and ran into an alley, Officer Calderon continued to follow Defendant, but tripped and fell and lost visual contact with Defendant while he was down. Officer Calderon got up from his fall and continued to chase Defendant, who had stopped near a dumpster where another JPD officer had blocked his exit. Officer Calderon handcuffed Defendant and asked why he ran. Defendant responded that he had a small amount of marijuana. On the body camera video, Defendant was heard telling the officers at least eight times that he had dropped the marijuana near the dumpster about fifty feet away from where he was arrested. The dumpster was surrounded on three sides by concrete walls and two of those walls were surrounded by trees. Officers began to search the area around the dumpster for the marijuana and suspected weapon. Officer Calderon explained that based on his observation and interaction with Defendant that night and other officers' prior interactions with Defendant, he suspected Defendant had a weapon. Officer Calderon found the marijuana between the concrete wall and the dumpster. Ultimately, other officers found Defendant's jacket and a firearm both within a short distance from the marijuana. A map of the area showing where the items were found was admitted into evidence. Officer Calderon marked Defendant's path of travel from the hotel to the alley, where Officer Calderon fell, Defendant's approximate location when Officer Calderon fell, and the location where the firearm was recovered.

Officer Calderon explained that the alley Defendant ran through was bordered on one side by a shopping center and on the other side by a retaining wall approximately nine

feet tall.  On the other side of the retaining wall was a tree line "about six or seven trees thick" and a neighborhood on the other side of the tree line.  Officers located the firearm above the retaining wall in the tree line.  Officer Calderon noted that the firearm had no moisture or condensation on it and there was dry dirt inside the barrel of the firearm.

On cross-examination, Officer Calderon explained that Defendant was not under arrest when he first approached Defendant at the hotel, but he was attempting to detain Defendant.  Officer Calderon admitted that he had testified at the preliminary hearing that the night of the offense was an "unusually warm night" and agreed that it would not have been unusual for a person to carry a jacket rather than wear it.  Officer Calderon also admitted that he did not witness Defendant commit a crime and did not personally observe a weapon under the jacket Defendant had folded over his arm.  Officer Calderon agreed that the alley was in a heavily trafficked area and accessible to the general public.  The firearm was discovered about fifty feet away from the dumpster where the jacket and marijuana were found.  Officer Calderon also testified that the firearm had rust on it when it was recovered.

On redirect examination, Officer Calderon explained that he thought it "would be absurd" to run from police because of a small amount of marijuana.  It was his belief that Defendant had concealed the firearm under the jacket because of the way Defendant held his right arm still and close to his body while he ran.  Officer Calderon also testified that he would have expected Defendant to put the marijuana in his pocket rather than under the jacket.  Officer Calderon affirmed that Defendant chose the direction of travel and led the foot pursuit to the alley.  He also affirmed that the firearm was found above the retaining wall directly across from the area where Defendant was when Officer Calderon fell and lost sight of Defendant.  Officer Calderon stated that it was possible, but not reasonable, to believe that the firearm was left by someone other than Defendant.  On recross-examination, Officer Calderon reaffirmed that there was nothing, other than trees, preventing the general public from accessing the area where the firearm was recovered.

JPD officer Ryan Brisco[1] heard through "radio chatter" that Officer Calderon was involved in a foot pursuit.  Because he was familiar with the alley through which Defendant was running, Officer Brisco positioned himself at the other end of the alley to block Defendant's exit.  After Defendant had been handcuffed, Officer Brisco searched the area where Defendant said he had dropped the marijuana; he recovered a dark-colored jacket near the trees behind the concrete structure surrounding the dumpster.  On cross-examination, Officer Brisco affirmed that the marijuana was found inside the concrete

---

[1] At the time of trial, Officer Brisco was employed as a Special Agent with the 26th Judicial Drug Task Force.

structure, the jacket was found outside of the concrete structure, and the firearm was found in a different area.

JPD Officer Shane Crabtree responded to the alley after Defendant had been placed into custody and decided to search the area above the retaining wall where Defendant was when Officer Calderon fell and lost sight of him. He explained that because the wall was "about nine feet tall," it was not easily accessible from the alley. Officer Crabtree found the firearm in the tree line about three to four feet from the top of the retaining wall and agreed that the firearm could have been thrown over the wall from the alley to that location. Footage from Officer Crabtree's body-worn camera was admitted into evidence and played for the jury. The video showed the discovery of the firearm in the tree line, slightly under a low branch, and Officer Crabtree's signaling other officers to respond to the area. Officer Crabtree explained that he did not turn on his body-worn camera until he discovered the firearm because he had not expected to find evidence in that location.

Tennessee Bureau of Investigation ("TBI") Special Agent Rachel Strandquist testified as an expert in forensic chemistry. Special Agent Strandquist had tested plant material received from JPD in this case and determined the plant material was marijuana. On cross-examination, Special Agent Strandquist testified that the TBI had a firearms unit, but she had no knowledge of whether that unit was involved in testing evidence in this case.

The State introduced certified copies of Defendant's Madison County convictions for aggravated assault, reckless endangerment with a deadly weapon, and possession of Schedule VI drugs in a drug-free zone, then rested its case. Defendant moved for judgments of acquittal on counts one through three, arguing that the State had failed to establish possession of the firearm. After reviewing the evidence presented, the trial court denied Defendant's motion for judgments of acquittal.

Defendant elected not to testify but recalled Officer Calderon. Officer Calderon confirmed that he did not notice the firearm until Officer Crabtree pointed it out to him. On cross-examination, Officer Calderon marked on the previously-admitted map the location where Defendant was arrested; he estimated that the firearm was recovered approximately 100 feet from where Defendant was arrested. Defendant then rested his case.

Based on the above evidence, the jury convicted Defendant as charged in the indictment of two counts of unlawful possession of a firearm after having been convicted of a felony crime of violence, one count of unlawful possession of a firearm after having been convicted of a felony drug offense, and one count of possession of a Schedule VI controlled substance.

The trial court held a sentencing hearing on May 22, 2023. The State introduced Defendant's presentence report which reflected that Defendant had twenty-five prior convictions, including aggravated assault, evading arrest with risk of death, criminal trespass, reckless endangerment with a deadly weapon, four drug offenses, and multiple traffic offenses. The presentence report also showed a confirmed gang affiliation. Defendant reported that he began using illegal drugs at the age of twelve and had last used drugs in August 2022. He reported use of marijuana, "bars," methamphetamine, "x-pills," and fentanyl. Defendant reported that he had attended a drug treatment program, but he did not report the date of the program and left after one week. Defendant's validated risk and needs assessment resulted in a score of "high violent[,]" with high needs in aggression, education, employment, mental health, and residential.

Defendant's mother testified that Defendant had been diagnosed with bipolar disorder and disruptive mood regulation as a child. She stated that he had attended mental health treatment programs in the past and asked the trial court to impose the minimum sentence.

Defendant testified that he did not think he was guilty, but he "was not going to complain about it." Defendant expressed that being incarcerated would not be beneficial to him because he needed "help like rehab or stuff like that[.]" On cross-examination, Defendant acknowledged that it was unlawful for him to possess a firearm on the night of the offenses because he had previously been convicted of a felony offense. Defendant admitted that he was guilty of "running from the . . . police" and "possessing that marijuana[,]" but he maintained that he had not possessed the firearm. When asked why he ran from Officer Calderon if he did not have a firearm, Defendant explained that he believed he would have been arrested because the woman had called the police, and he was on bond; he stated that he ran from police "[e]very time." Defendant explained that the domestic disturbance call began because the woman learned that he had cheated on her, and he had pushed her down. Defendant stated that he told Officer Calderon where the marijuana was only twice. On redirect examination, Defendant agreed that he understood that he could not possess a firearm and would not possess any firearms in the future.

The State argued for an enhanced in-range sentence because Defendant had prior convictions in addition to those that established his punishment range, and Defendant was on bond at the time of the current offenses. *See* T.C.A. § 40-35-114(1), (8), (13). The State also noted that because Defendant was on bond at the time he committed the offenses and was subsequently convicted of the charges on which he had been released on bond, the sentence in this case was required to be served consecutively to that sentence. *See id.* at § 40-20-111(b). The State also asked the trial court to consider Defendant's lengthy criminal

history from age eighteen until present day, which included convictions for offenses committed while on probation.

Defendant urged the trial court to impose the minimum sentence of twelve years because twelve years at eighty-five percent would be "a significant amount of time, especially with someone who ha[d] a minimal . . . criminal history. He ha[d] one prior violent felony." Defendant argued that his criminal conduct "neither caused nor threatened serious bodily injury" because the firearm was unloaded and was never seen in his possession or fired. *See id.* at § 40-35-113(1).

The trial court considered of all the evidence presented at trial and at the sentencing hearing, the purposes and principles of the Sentencing Act, the nature and characteristics of the criminal conduct, statistical information provided by the administrative office of the courts, and Defendant's potential for rehabilitation and treatment. The trial court noted that "this is a serious matter because it involve[d] a convicted felon, actually four[-]time convicted felon, being in possession of a firearm on that particular occasion." It also noted that the legislature had mandated "serious punishment" for felons found to be in possession of a firearm.

The trial court found Defendant to be a Range II, multiple offender. The trial court applied and gave great weight to three enhancement factors: Defendant had a previous history of criminal convictions and criminal behavior in addition to those necessary to establish the appropriate range, specifically noting Defendant's felony convictions for evading arrest and reckless endangerment with a deadly weapon and twenty-one prior misdemeanor convictions; Defendant failed to comply with the conditions of a sentence involving release into the community, specifically that "on at least five different occasions" Defendant had committed new offenses while on probation; and Defendant was on pretrial release at the time of the current offenses. *See* T.C.A. § 40-35-114(1), (8), (13). The trial court also noted Defendant's confirmed gang affiliation but clarified that this was only one of the factors that trial court would consider. The trial court did not find any applicable mitigating factors. The trial court noted Defendant's "pretty substantial use of illegal drugs throughout his lifetime[,]" the most recent of which was during the pendency of the current case. The trial court found that Defendant had not sincerely sought drug addiction treatment because Defendant left one week into the treatment program. The trial court noted that the presentence report indicated Defendant had nine children, five of whom were younger than one year old, but it did not consider Defendant's numerous children to be mitigating.

The trial court sentenced Defendant to twenty years for counts one and two, ten years for count three, and eleven-months-and-twenty-nine-days for count four. Counts

one, two, and three merged, and count four was ordered to be served concurrently, for an effective twenty-year sentence.

Defendant filed a timely motion for new trial, which the trial court denied on August 3, 2023. Defendant's timely appeal followed.

**Analysis**

I. Sufficiency of the Evidence

Defendant asserts that there is insufficient evidence that he possessed the firearm because no officer actually saw him possess the firearm, the firearm was located between fifty to one hundred feet away from where he was arrested in a heavily trafficked public area, and there was no fingerprint analysis conducted. Defendant does not challenge that he was a felon on the night of the offenses nor does he challenge his conviction for simple possession of marijuana. The State argues that the evidence sufficiently established that Defendant possessed the firearm. We agree with the State.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). Further, circumstantial evidence need not remove every reasonable hypothesis except that of guilt. *Id.* at 381 (quoting *United State v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the

- 7 -

circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

As relevant to this appeal:

(b)(1) A person commits an offense who unlawfully possesses a firearm, as defined in § 39-11-106, and:

    (A) Has been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon; or

    (B) Has been convicted of a felony drug offense.

T.C.A. § 39-17-1307(b)(1)(A), (B). Aggravated assault is a felony crime of violence. *Id.* at § 39-17-1301(3). Possession may be either actual or constructive. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). "While actual possession refers to physical control over an item, constructive possession requires only that a defendant have 'the power and intention . . . to exercise dominion and control over' the item allegedly possessed." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014) (quoting *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013)). While constructive possession is evaluated based on the totality of the circumstances, mere presence in the area where an item is found is not, alone, sufficient to establish constructive possession. *State v. Siner*, No. W2020-01719-CCA-R3-CD, 2022 WL 252354, at *5 (Tenn. Crim. App. Jan. 27, 2022) (first citing *State v. Richards*, 286 S.W.3d 873, 881 (Tenn. 2009); and then citing *Robinson*, 400 S.W.3d at 534), *no perm. app. filed*. While flight alone is insufficient to establish a defendant's guilt, the jury may consider it along with all other relevant facts. *State v. Berry*, 141 S.W.3d 549, 587-88 (Tenn. 2004) (citing 7 Tenn. Prac. Pattern Jury Instr. T.P.I. – Crim. 42.18). Further, discovery of contraband along a defendant's flight path reinforces the sufficiency of the evidence supporting a conviction for possession of contraband. *State v. Hart*, 676 S.W.3d 103, 108 (Tenn. Crim. App. June 12, 2023) (first citing *State v. White*, No. E2022-00279-CCA-R3-CD, 2022 WL 17413628, at *4 (Tenn. Crim. App. Dec. 5, 2022), *no perm. app. filed*; and then citing *State v. Wentz*, No. M2010-01668-CCA-R3-CD, 2011 WL 3654539, at *5 (Tenn. Crim. App. Aug. 19, 2011)). Finally, the statute does not require a showing that the firearm is operational, but only requires that it "will or is designed to or may readily be converted to expel a projectile by the action of an explosive[.]" T.C.A. § 39-11-106 (2021); *See State v. Barnett*, No.

M2017-02317-CCA-R3-CD, 2019 WL 1057386, at *5 (Tenn. Crim. App. Mar. 6, 2019) (holding that the possession of a firearm by a convicted felon did not require a showing that the firearm was operational under the version of the statute in effect in 2014) (quoting T.C.A § 39-11-106(11) (2014)).

When viewed in the light most favorable to the State, the evidence showed that Officer Calderon responded to a domestic disturbance call at the America's Best Value Inn and Suites. Officer Calderon saw Defendant exit the hotel while holding a dark-colored jacket over his right arm which he held close to his body. Defendant attempted to distract Officer Calderon and then fled. Officer Calderon pursued Defendant maintaining visual contact with Defendant until Officer Calderon fell. Defendant continued to run through the alley until his exit was blocked by Officer Brisco. While Officer Calderon did not see Defendant discard any items, Defendant told Officer Calderon he had dropped marijuana while running and told Officer Calderon where to find it. Officers found the marijuana and the jacket a short distance away from the marijuana, also along Defendant's flight path. The firearm was found above the retaining wall which ran parallel to Defendant's flight path, across from the area where Defendant was when Officer Calderon fell and within a distance that it could have been thrown from Defendant's flight path. While there had been precipitation on the night of the offenses, the firearm was dry and had dried dirt in the barrel. According to the map exhibited to Officer Calderon's testimony, the alley was bordered on one side by businesses and on the other the retaining wall. On the other side of the retaining wall was a row of trees and a neighborhood on the other side of the trees.

Defendant asserts that the evidence was insufficient because the State relied upon Defendant's "brief presence in an area where a firearm was discarded to support its theory[.]" In support of this position, Defendant relies on *Siner*, in which this court reversed the defendant's convictions because there was insufficient evidence that he possessed the firearm and oxycodone pills. *Siner*, 2022 WL 252354, at *7. In *Siner*, the defendant was seated in the front passenger seat of a vehicle driven by his girlfriend when police conducted a traffic stop. *Id.* at *1. The officer smelled marijuana in the vehicle and a subsequent search of the vehicle revealed, in relevant part, oxycodone pills in the center console "underneath a pile of paperwork" and a loaded firearm underneath the front passenger seat within reach of the defendant. *Id.* The officer testified at trial that he did not attempt to retrieve fingerprints from the firearm or establish ownership of the firearm, that the backseat passenger could reach the firearm, and that the defendant did not reach under the seat during the traffic stop. *Id.* at *2. This court reversed the defendant's convictions for possession of the firearm because "there was absolutely nothing beyond the Defendant's physical proximity to the weapon to establish any kind of nexus of possession[,]" specifically noting that the defendant was neither the owner nor the operator of the vehicle, the firearm was not in plain view, and the defendant "never

- 9 -

made any movements indicative of reaching under the seat." *Id.* at *7. Similarly, this court reversed the defendant's conviction for possession of the oxycodone pills because there was "no evidence that the [d]efendant ever accessed the console, that he knew of the existence of the pills, or that the presence of a bottle of prescription medication was in some way obviously unlawful." *Id.*

We find *Siner* factually distinct from the present case. Here, in addition to Defendant's presence near the location where the firearm was discovered, Defendant was seen holding his arm in an unnatural position with a jacket over his arm while he fled from the police, an indication that he was concealing something under the jacket. Defendant admitted that he discarded contraband as he fled, and the jacket he had held over his arm was found in a different location along his flight path than the marijuana, an indication that he discarded the items as he ran. Defendant also continued to point officers to the marijuana as the only contraband he had. While it is true that there was no fingerprint evidence connecting Defendant to the firearm, such lack of evidence does not invalidate his convictions so long as there was other evidence that sufficiently showed that he possessed the firearm. *See Hart*, 767 S.W.3d at 108 (citing *State v. Sawyer*, No. W2018-01267-CCA-R3-CD, 2019 WL 1560864, at *3 (Tenn. Crim. App. Apr. 10, 2019)) (noting that "[a] conviction is not undermined by a lack of DNA or fingerprint evidence if there is legally sufficient evidence of guilt otherwise"). Defendant's conviction was based on more than "mere presence" as was the case in *Siner*.

We find Defendant's case much more analogous to *Wentz*. In *Wentz*, the officer initiated a traffic stop and the defendant fled the scene. 2011 WL 3654539, at *1. During the foot pursuit, the defendant "kept his hand 'concentrated on his waist band'" and discarded a plastic Wal-Mart bag, which was later found to be empty, before the officer lost sight of the defendant. *Id.* at *2. After the defendant was apprehended, other officers followed his flight path through both public and private areas and discovered a small plastic bag containing cocaine on the ground between two houses near the defendant's flight path. *Id.* This court upheld the defendant's conviction for possession of cocaine based on the officer's observation that the defendant "repeatedly" reached in his pants and discarded "at least one item" and the discovery of cocaine along the defendant's flight path. *Id.* at *5. In this case, Officer Calderon saw Defendant holding his right arm covered by a jacket close to his body while running. Defendant admitted to throwing marijuana, which was found along Defendant's flight path, and Officer Crabtree also discovered the firearm a short distance from Defendant's actual flight path. The jury was able to observe Defendant's actions on Officer Calderon's body camera video.

Defendant's assertion that the firearm was placed in the tree line by an unconnected party is a possible hypothesis. However, "the state does not have the duty to exclude every other hypothesis except that of guilt." *State v. Patlan*, No. M2011-

- 10 -

01175-CCA-RM-CD, 2011 WL 2848395, at *7 (Tenn. Crim. App. July 18, 2011) (citing *Dorantes*, 331 S.W.3d at 381). Based on the evidence presented at trial, a reasonable jury could have disregarded such a possibility and concluded beyond a reasonable doubt that Defendant possessed the firearm when he exited the hotel, fled from Officer Calderon in an attempt to avoid being detained with a firearm and marijuana in his possession, discarded the contraband along his flight path, and attempted to divert attention from the firearm by directing officers to the marijuana. Defendant is not entitled to relief.

## II. Sentencing

Defendant argues that the trial court abused its discretion by imposing "the maximum in-range sentence for a single firearm conviction resulting in a total effective sentence of twenty years" because it was not the least severe measure necessary. The State asserts that the trial court properly exercised its discretion in sentencing Defendant. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

Once a trial court determines the appropriate range of punishment, the trial court must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report, including a validated risk and needs assessment; (3) any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any applicable mitigating and enhancement factors; (6) any statement the defendant makes on his behalf; and (7) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee. *Id.* at § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence was imposed." *Id.* at § 40-35-103(2), (4).

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App.

- 11 -

Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *no perm. app. filed*. It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2007)), *no perm. app. filed.*

Here, the trial court found that Defendant was a Range II, multiple offender and noted that there were no sentencing alternatives available to Defendant. *See* T.C.A. § 40-35-112(b)(2) (mandating that a Range II sentence for a Class B felony is twelve to twenty years); *id.* at § 40-35-102(6)(A) (noting that Range II offenders are not considered favorable candidates for alternative sentencing). The trial court also considered the statutory factors listed in Tennessee Code Annotated section 40-35-210(b). Although the trial court did not explicitly state that the sentence was the least severe measure necessary, based on all the findings the trial court did make, the record is sufficient to infer that the trial court considered and ultimately found that the twenty-year sentence was the least severe measure necessary. *State v. Mahaffey*, No. W2022-01778-CCA-R3-CD, 2024 WL 418130 (Tenn. Crim. App. Feb. 5, 2024) (concluding that the record is sufficient to infer consideration of whether the sentence was justly deserved in relation to seriousness of the offense and the least severe measure necessary) (citing *State v. Henderson*, No. W2022-00882-CCA-R3-CD, 2023 WL 4105937, at *7 (Tenn. Crim. App. June 21, 2023)), *no perm. app. filed*.

First, Defendant complains that the trial court failed to view his "willingness to disclose his prior drug use in a positive light" and instead used it "as fuel for sentence enhancement." Under Tennessee law, prior criminal behavior, which extends beyond just criminal convictions, may be considered as an enhancement factor. T.C.A. § 40-35-114(1); *State v. Rogers*, No. M2022-01328-CCA-R3-CD, 2023 WL 7276667, at *12 (Tenn. Crim. App. Nov. 3, 2023) (holding that the trial court properly applied enhancement factor one based on the defendant's prior convictions and "history of illegal drug use"), *no perm. app. filed*. Here, the trial court considered Defendant's prior drug use, which it described as "pretty substantial[.]" The trial court further found that Defendant had not sincerely sought drug treatment in the past because he self-reported that he had left the program after one week. Defendant is not entitled to relief simply because he was truthful with the hope that the trial court would look favorably at his truthfulness. Further, although Defendant reported, and his mother testified, that he struggled due to his mental health diagnoses, he did not assert that his mental health caused him to commit the current offenses.

Next, Defendant contends that the trial court erred by refusing to find the fact that Defendant was a father to nine minor children as a mitigating factor. Defendant notes that the presentence report writer found it a "protective factor" that he did not have any restrictions related to the children. As the State notes, Defendant does not cite any authority

to support that the trial court's refusal to consider this as mitigating evidence was error. While a trial court should consider mitigating evidence put forth by a defendant, it is within the trial court's discretion to determine what weight, if any, it assigns to such mitigation. *See State v. Jackson*, No. W2021-00208-CCA-R3-CD, 2022 WL 370090, at *4 (Tenn. Crim. App. Feb. 8, 2022) (noting that the trial court should have considered the mitigating evidence even if it ultimately assigned no weight to it), *no perm. app. filed*. Although Defendant did not request that the trial court consider his minor children or lack of restrictions related to the children as mitigating evidence, the trial court extensively reviewed the presentence report and specifically noted Defendant's minor children. Defendant did not present any evidence to establish that he had a positive relationship with his children or how his potential incarceration would have impacted his relationship with his children. *See State v. Mays*, No. M2001-02446-CCA-R3-CD, 2002 WL 1949695, at *6 (Tenn. Crim. App. Aug. 23, 2002) (agreeing with the proposition that "a desirable relationship between a parent and child" may be a mitigating factor but refusing to find that the trial court erred by not applying such when the defendant failed to present evidence establishing a positive relationship with his children). We cannot conclude that the trial court abused its discretion in refusing to find Defendant's children a mitigating factor.

Finally, Defendant asserts that in enhancing his sentence based on his criminal history, the trial court failed to consider that twelve of his twenty-one misdemeanor convictions were for traffic offenses. The record is clear that the trial court addressed Defendant's entire criminal history and Defendant still had nine other misdemeanor convictions and two felony convictions in addition to those needed to establish his sentencing range. *See State v. Ford*, No. M1999-2362-CCA-R3-CD, 2000 WL 1520021, at *3 (Tenn. Crim. App. Oct. 13, 2000) (concluding that enhancement factor one was properly applied based on three prior misdemeanor convictions, one prior felony conviction, and multiple traffic offenses). The trial court properly considered Defendant's criminal history and applied it as an enhancement factor.

The trial court did not abuse its discretion in imposing the maximum within range sentence for count one, for an effective twenty-year sentence. Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

---

JILL BARTEE AYERS, JUDGE

- 13 -